

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**March 16, 2020 19:56**

By: TYRONE E. REED 0030839

Confirmation Nbr. 1969711

LORINZO SAMPSON                                  CV 20 931048

vs.

THE CITY OF CLEVELAND, ET. AL.,, ET AL          **Judge:**  JOSEPH D. RUSSO

**Pages Filed:**  36



IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| Lorinzo Sampson,<br>3768 E. 154th Street<br>Cleveland, OH 44128 | ) | CASE NO. _____ |
| Plaintiff, | ) | |
| -vs- | ) | JUDGE: _____ |
| The City of Cleveland<br>601 Lakeside Ave<br>Cleveland, Ohio 44114 | ) | |
| Defendant (1) | ) | |
| Donald Horvat,<br>(in his official and individual capacities)<br>c/o Department of Law<br>601 Lakeside Ave<br>Cleveland, Ohio 44114 | )<br><br>) | **COMPLAINT WITH JURY<br>DEMAND** |
| Defendant (2) | | |
| Cuyahoga County<br>2079 East Ninth Street<br>Cleveland, Ohio 44115 | ) | |
| Defendant (3) | ) | |
| Nicholas Evans<br>(in his official and individual capacities)<br>c/o Department of Law<br>2079 East Ninth Street<br> Cleveland, Ohio 44115 | )<br><br>) | |
| Defendant (4) | | |
| Christopher Little<br>(in his official and individual capacities)<br>c/o Department of Law | ) | |

2079 East Ninth Street                          )
 Cleveland, Ohio 44115

   Defendant (5)
                                                )

Brandon Smith
 (in his official and individual capacities)
c/o Department of Law
2079 East Ninth Street                          )
Cleveland, Ohio 44115


   Defendant (6)                )


Timothy Dugan
(in his official and individual capacities)     )
c/o Department of Law
2079 East Ninth Street
 Cleveland, Ohio 44115
                                                )
   Defendant (7)


Barry Hickerson
(in his official and individual capacities)     )
c/o Department of Law
2079 East Ninth Street
Cleveland, Ohio 44115,


   Defendant (8)                )


and John Does (9- 13) and Jane Doe (14)
(in their official and individual capacities)   )
c/o Department of Law
2079 East Ninth Street
Cleveland, Ohio 44115,


   All Defendants.              )


   Now comes Lorinzo Sampson, by and through undersigned counsel, and herebystates the

following:

PARTIES

Nicholas Evans, Christopher Little, Brandon Smith, Timothy Dugan, Barry Hickerson  and others.

1. Plaintiff Lorinzo Sampson is a resident of Ohio currently residing at 3768 E. 154th StreetCleveland, Ohio 44128.

2. Defendant (1) City of Cleveland (the "City") is an Ohio municipal corporation under Article XVIII of the Ohio Constitution and Title VII of the Ohio Revised Code.

3. Defendant (2) Donald Horvat is an individual and police officer and detailed to the N.I.C.E unit with the Cleveland Police Department.

4. Defendant (3) Cuyahoga is a County situated in the State of Ohio having all Corporate Powers, Rights and Privileges Under Article I—XV of the Ohio Constitution and Title VII of the Ohio Revised Code.

5. Defendants (4)-(8) are individuals and deputy correctional officers employed at Cuyahoga County Jail and members of the SRT [Special Response Team] a team of corrections officers who dress in black paramilitary garb and respond to various incidents within the jail. Nicknamed "The Men in Black,"

6. Defendants (9)-(13) are also individuals and deputy correctional officers employed atCuyahoga County Jail and members of the SRTwhose names and addresses are currently unknown despite reasonable efforts to discover them.

JURISDICTION

7. The facts giving rise to this Complaint occurred in Cuyahoga County, thereby making jurisdiction and venue proper in this Court.

GENERAL ALLEGATIONS

8. Plaintiff repeats and alleges paragraphs 1 through 7 as though fully set forth herein.

9. On December 22, 2018 Plaintiff was standing in the driveway drinking a non-acholic beverage while visiting his uncle's home on 128th Street between Kinsman and Union Street (Mt. Pleasant development area).DefendantDonald Horvat, a plain clothes officer and team member of the N.I.C.E. (Neighborhood Impact and Community Engagement) was dressed in plain clothes and was driving an unmarked police vehicle when he stopped Plaintiff in the driveway and began questioning him about a parked car outside of his uncle's home with two (2) individual passengers occupying the car.

10. Plaintiff stated that he did not know anything about the car or the individual passengersthat were sitting in the parked carand refused to answer any further questions from Defendant, Donald Hovart, then issued Plaintiff a citation for having an open container, which Plaintiff not only refused to sign, but demanded to speak with Defendant's supervisor.

11. Defendant Hovart informed Plaintiff that he had a right to request to speak to his supervisor, but he would have to be taken downtown to submit his complaint to the supervisor in person. Plaintiff complied with Defendant's request and wasplaced in the backseat of the unmarked police cruiser without handcuffs or any other restraints to be escorted downtown to the Justice

Center for the purpose of submitting his complaint to the supervising officer.  After a short period of time Defendant placed Plaintiff in handcuffs, he was not taken before Defendant's supervisor to state or make a written complaint. Instead, Defendant stated to Plaintiff that he was going to booking for fingerprinting and to be thrown in a jail cell.

12. Plaintiff stated that he had been tricked into custody, and during fingerprinting demanded once again to speak to a supervisor. Plaintiff's  was told he was a smart ass by Defendant Hovart and his request was denied.

13. An argument ensued between Defendant Hovart, members of the SRT [Special Response Team] Correctional Officer Defendants and Plaintiff was pushed and tackled and slammed to the concrete floor by several Defendants.

14. After Plaintiff was slammed to the floor Defendants punched him in the mouth and face repeatedly, severely stomping him and beating him with a pepper spray can, after knocking his tooth out, Plaintiff laid on the  floor unconscious and bleeding with serious personal and physical injuries. Upon information and belief during the incident Defendants' body cameras were either off, or the incident took place out of the view of all cameras to cover up Defendants' brutal and corrupt acts.

15. Defendants laughed and joked during the beating calling him the "Eric Gardner tough guy" you're the tough guy "MF".  Plaintiff sustained emotional and psychological injury, as well as, injuries to the mouth, neck, eye, stomach, ribs, a dislocated finger, and brain trauma.

16. Plaintiff was charged under Case No. 2018 CRB 022483 with violations of Municipal Ordinance COUNT (1) 617.07 Open Container Prohibited, and COUNT (2) 605.03 Disorderly Conduct.

5

17. After the beatings, detainment and charges Cuyahoga County Defendants denied Plaintiff medical access and treatment to his sustained dislocated finger, neck and upper body injuries, Defendants stripped Plaintiff of his outer clothing and placed him directly in an isolated and extremely cold, dark, rubber cell and restrained Plaintiff's arms and legs to a chair for approximately twelve (12) hours.

18.To no avail, Plaintiff complained of having difficulty in breathing due to the lack of his asthma medication and while in extreme pain cried out to Defendants for medical treatment, for release from restraints to use restroom facilities. Defendants ignored Plaintiff's calls for help.

19. Plaintiff was not onlydenied medical attention for his open wounds, but was also denied water, food and left to defecate and urinate on himself while being restrained to the chair for twelve (12) hours.On December 23, 2018, Cuyahoga County Defendants released Plaintiff on a personal bond, Plaintiff upon release temporarily lost his eyesight and had to be picked up by his wife and rushed to the emergency room at University Hospital in Cleveland, Ohio.

20. Plaintiff was also diagnosed with PTSD caused by Defendants brutal treatment and is a long-term patient of psychotherapy treatment and is currently in treatment and prescribed with medication for his psychological condition and emotional pain and suffering.

21. On March 20, 2019, Plaintiff proceeded to a criminal trial on Municipal Ordinance COUNT (1) 617.07 Open Container Prohibited, and COUNT (2) 605.03 Disorderly Conduct and was found not guilty on counts 1 and 2 of the Complaint and affidavit signed by Defendant Hovart.

22. Common knowledge is centered on the common sense premise that oftentimes two people sitting in a parked car are not likely to be involved in criminal activity merely because of their presence as passengers in a vehicle.

23. Unfortunately for Plaintiff, Defendant Hovart, if he had reasonable suspicion that a crime was being committed or about to be committed, failed to properly investigate the parked vehicle and its passenger occupants.

24. Instead Defendant turned his investigation on Plaintiff an innocent bystander and invitee at the home of his uncle for a Christmas celebration.

25. Plaintiff, an African American, in turn believing that he was being racially profiled requested to speak to and submit a complaint to Defendant's supervisor.

26. Defendant a team member of the N.I.C.E. unitlured Plaintiff into an unmarked police vehicle without handcuffs, and Plaintiff believing that Defendant Horvat was in compliance with the goals and objective of the N.I.C.E. unit willing and voluntarilywithout an arrest warrant hopped into the police vehicle to ride downtown to submita written grievance to the supervising officer.

27. All Cuyahoga County Defendantsknew or should have known at the time that Plaintiff arrived at the County Jail escorted by Defendant Hovart without handcuffs or restraints of any kindthat Plaintiff was not under arrest and was notbrought to the Justice Center for purpose of arrest for being in violation of any Ohio law.

28. On January 4, 2019, Defendant City of Cleveland's prosecutor movedforward on the criminal complaints to the Municipal Court arraigning Plaintiff on criminal charges.

29. Based on the case file and lack of probable cause for the arrest which was based on false statements by Defendant Hovart, contained many material omissions and completely unsubstantiated facts reported by Defendant Hovart which Defendant City of Cleveland should have known were untrue.

30. Had the truth been told to the Judge and key material omissions not been made byDefendant City of Cleveland, then surely the Judge would not have issued a trial order.

31. Specifically, the Judge commented on the facts of the case in relevant part stating that if the incident had occurred in a suburb, Plaintiff Lorinzo Sampson would not have been arrested and charged with crimes.

32. All of these factors were imminently discoverable and able to be reviewed by Defendants before making an unlawful arrest of Plaintiff.

33. Defendant Hovart knew about the vicious customs and corrupt practices of his co-Defendants (SRT team members) and Defendant Cuyahoga County, as administered upon Plaintiff and other similarly situated individuals. To this day, Defendants have not been charged with anything as it relates to theirunlawful actions in this matter.

34. In addition to the above-described treatment of Mr. Sampson—including the campaign of retaliation that followed his complaint to the Cuyahoga County Sheriff Department officials regarding the abuse running rampant in the jail—corrections staff, as part of a custom, policy, pattern, and practice, have perpetrated many additional unprovoked and unwarranted acts of violence on the people incarcerated in the jail along with other constitutional-rights violations. Some of those acts as what similarly happened to Plaintiff Sampson are described in the following paragraphs.

35. A corrections officer smashed Joshua Castleberry's teeth into his nose for throwing a bologna sandwich.

36. On February 5, 2018, Joshua Castleberry while in the county jail. He secreted an extra bologna sandwich from the dining hall to his cell, and, when nabbed, he threw the sandwich atjail staff. The officers' response to the indignity was savage. After handcuffing Mr. Castleberry, officers John Wilson and Jason Jozwiak smashed Mr. Castleberry's face so violently into the ground that his front teeth came out of his nose. They placed him in a restraint chair and jammed a mask over his broken face to conceal their assault from medical staff.

37. At the time, Ken Mills was the administrator of the jail. (Mills has since resigned and been indicted based on his jail-related conduct.) His officers refused to let nursing staff remove the mask to assess Mr. Castleberry's injuries, but a night nurse saw Mr. Casdeberry and requested medical evaluation. The security supervisor refused, saying: "He wants to try and hit one of my officers — he can sit the F there for hours."

38. The night nurse called the nursing supervisor — Gary Brack, R.N. — at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the Defendant County waited another half-hour before transporting Mr. Castleberry to medical. The mask was lifted, EMS was called, and Mr. Castleberry was transported to the hospital for surgery to remove the tooth from his nasal cavity and reconstruct his face.

39. The next day at the monthly sheriffs meeting, Mills covered up the abuse. When asked about the incident, Mills stated: "I reviewed the situation and the officers used appropriate force to the threat of what the incarcerated citizen was using." Medical Director Dr. Thomas Tailman asked to view the security footage, but Mills refused, saying: "I already reviewed it — nothing was done wrong."

9

40. Former Sheriff Clifford Pinkney stated that he would follow up with the incident, but when he went to review the footage, the security and body-camera footage had somehow "disappeared."

41. Wilson was indicted for felonious assault in the second degree and misdemeanor charges of interfering with civil rights and unlawful restraint. Jozwiak was charged with unlawful restraint and interfering with civil rights.

42. No one else was held accountable.

43. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.Corrections officers emptied a can of pepper spray in Chantelle Glass's face while she was confined in a restraint chair and failed to decontaminate her to prolong her agony.

44. Chantelle Glass was booked into the county jail on July 16, 2018, after police discovered a warrant stemming from an outstanding traffic ticket.

45. Ms. Glass requested a phone call, so that she could inform her family of her arrest, and contact an attorney. The guards repeatedly refused Ms. Glass's request.

46. When Ms. Glass persisted in her request after being placed in a holding cell, corrections officers threatened that if she did not stop, they would tie her down and "mace" her. Ms. Glass continued to request her phone call, and officers called Corporal Idris-Farid Clark, a supervisory officer.

Electronically Filed 03/16/2020 19:56 / / CV 20 931048 / Confirmation Nbr. 1969711 / CLAJB

47. Corrections officer Robert Marsh retrieved a restraint chair. Video surveillance shows Clark remove his can of pepper spray from his tactical vest, shake it, and return it to his vest pocket before Ms. Glass was even brought out of her cell.

48. Ms. Glass cooperated as officers escorted her out of her cell in handcuffs and strapped her into a restraint chair. As Marsh continued tightening the restraints, Clark again took out his pepper spray and again shook the canister.

49. When Marsh reached between Ms. Glass's knees, she instinctually drew her legs together out of fear. She made no other movements. Ms. Glass-strapped into the restraint chair-could not pose any threat to the officers.

50. Rather than step back when Ms. Glass flinched, Marsh stepped in and punched her in the head. She flailed in her restraints, trying in vain to protect herself.

51. Corporal Clark than stepped up to make good on his colleague's threat to "mace" Ms. Glass. He emptied an entire canister of pepper spray onto Ms. Glass's face. Ms. Glass tried to turn her head to avoid the spray, but Mr. Clark grabbed her hair to hold her head still while deploying the pepper spray inches from her eyes.

52. When the attack concluded, Ms. Glass asked Clark: "Why did you mace me?" He responded: "Because you talk too much."

53. Rather than providing Ms. Glass with prompt and adequate medical care, the officers wheeled her to a utility closet. Minutes passed before officers began "decontamination" by thrice spritzing Ms. Glass's face and the top of her head with water. This did not effectively

decontaminate Ms. Glass (nor was it intended to). Pepper spray still covered her face, neck, and chest after the "decontamination" concluded.

54. Clark then wheeled Ms. Glass to the medical unit. Having access to medical personnel did not improve matters given the medical staffs participation in the corrections officers' deliberate indifference to and apparent enjoyment of Ms. Glass's agony. The sole "medical care" provided by Nurse Diane Lessmann was dabbing Ms. Glass's eyes with gauze. This nurse did not explain to Ms. Glass what was happening to her or display any compassion for her pain.

55. When Ms. Glass left the medical unit, pepper spray was still visible on her face, neck, and chest. Ms. Glass was placed alone in an isolation cell still restrained and covered in pepper sprayfor over two hours and denied her access to food, water, and the opportunity to use the restroom facilities.

56. For her entire 48-hour stay in the jail, corrections staff denied Ms. Glass's requests to shower.

57. For her entire 48-hour stay in the jail, Ms. Glass remained in the same clothing contaminated with pepper spray and urine.

58. Ms. Glass was released on July 18, 2018, after New Jersey officials confirmed that they did not want her extradited on the old warrant.

59. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.Blanche Hill endured a 12-hour confinement to a restraint chair, and was denied access to restroom by jail staff.

60. Also in July 2018, Blanche Hill was booked into the county jail.

61. Without any legitimate reason to do so, jail staff confined Ms. Hill to a restraint chair for many hours and denied her food, water, and the opportunity to use the restroom facilities.

62. The jail held no one accountable.

63. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

64. A corrections officer choked and dragged Tyrone Hipps, Jr. because he complained about being denied the opportunity to pray.

65. Tyrone Hipps, Jr. was booked into the county jail on June 22, 2018. He informed the officers that he is a Muslim and requested a no-pork diet.

66. Practicing Muslims must pray five times per day, facing east toward the holy city of Mecca.

67. On November .3, 2018, Mr. Hipps was preparing to pray at the eastern end of his dormitory when Officer Christopher Perdue approached Mr. Hipps and told him to go to his bed area. Mr. Hipps explained that he was about to pray. Perdue said: "Pray by your bed." Mr. Hipps explained that praying by his bed was improper because he is required to pray facing the east with no one walking in front of him. Perdue then told Mr. Hipps to go pray in the day area. Mr. Hipps explained that praying in the day area would also be improper because people would still be in front of him while he was praying. Mr. Hipps tried to explain the importance of observing proper prayer protocols.

68. In response to Mr. Hipps's explication of his religious custom, Perdue threatened to send Mr. Hipps to the hole. Mr. Hipps asked Perdue to get the corporal to resolve the issue. Perdue left, returned a few seconds later without the corporal, and threatened: "I'm going to give you three chances to move, if you don't move by the third, I'm going to move you myself."

69. Mr. Hipps complied with Perdue's command, picked up his prayer rug, and walked towards his bunk. He said: "This is my religion. I could sue you for this." Perdue responded: "I'll give you something to sue for." Perdue grabbed Mr. Hipps and put him in a chokehold. Perdue dragged Mr. Hipps to the front of the pod, threw him on his face, and told him to stop resisting.

70. Another officer had to physically remove Perdue from Mr. Hipps.

71. Despite having done nothing wrong; Mr. Hipps spent the next five days in the hole.

72. He remained in the hole for two days after an investigator visited Mr. Hipps in the hole and confirmed that the video showed he had done nothing wrong.

73. Despite Perdue's vicious attack on Mr. Hipps, jail administration did not place Perdue on leave or even separate Perdue from Mr. Hipps. Perdue constantly taunted Mr. Hipps when he returned from the hole.

74. No one has been held accountable for attacking Mr. Hipps.

75. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.A corrections officer attacked Glenn Mayer, Jr. as he was receiving medication in the medical unit.

14

76. Glenn Mayer, Jr. was in the county jail in October 2018. Mr. Mayer has a medical condition that causes him to twitch. Mr. Mayer takes medication to help control his condition.

77. On October 16, 2018, during the evening medication pass, a nurse was administering Mr. Mayer's medication, steadying his hand to place the medication into it. Mr. Mayer began to twitch. Officer Darriell Hayes gripped Mr. Mayer's neck from behind and choked him.

78. The nurse told Hayes to leave Mr. Mayer alone, that it was normal for him to twitch in that manner due to his condition. Hayes did not cease despite this admonition.

79. Hayes failed to document his use of force in an incident report, to report his use of force to his immediate supervisor, and to log his use of force into the 6-B pod log book, which are all required by the written jail policies.

80. Hayes's attack left Mr. Mayer with temporary paralysis.

81. No one has been held accountable for attacking Mr. Mayer.

82. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there. The Jail staff moved Joseph Sawyer from his wheelchair to restraint chair, beat, and pepper sprayed him for no reason.

83. In October 2018, Joseph Sawyer was booked into the jail. Mr. Sawyer is confined to a wheelchair due to a degenerative bone condition. Without any legitimate reason to do so, jail staff removed Mr. Sawyer from his wheelchair and strapped him into a restraint chair, slapped and punched his face, and pepper sprayed him.

84. Jail staff failed to effectively decontaminate Mr. Sawyer from the pepper spray and refused to permit him to shower or change clothes for more than a week. Jail staff also denied him the use of a wheelchair.

85. The jail held no one accountable.

86. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.Smith violently shoved Timothy Bennett while he was receiving an injection from medical staff.

87. On information and belief, the same day in November 2018, that Defendant Smith threatened and viciously attacked yet another inmate,Corrionne Lawrence, who had reported abuses to the marshals and federal officials, Smith also attacked Timothy Bennett as he was receiving an injection from medical staff, pushingBennett while the needle was inserted in his back.

88. On information and belief, Corporal Honaker actually wrote up Smith for this violent outburst. Compared with the many, many times that corrections staff imposed punitive violence with no consequence, Honaker's isolated write up of Smith was an anomaly.

89. On information and belief, this stray instance of showing mild displeasure at an SRTofficer hurting someone in custody was motivated by either the presence of medical staff during the incident or the ongoing federal investigation that Smith was furious about.

90. Subsequently, the Jail staff restrained, beat, and pepper sprayed Antoine Blackshear without legitimate reason to do so.

91. In December 2018, without any legitimate reason to do so, jail staff confined AntoineBlackshear to a restraint chair, beat him, and pepper sprayed him.

92. Jail staff failed to adequately decontaminate Mr. Blackshear before releasing him.

93. The jail held no one accountable.

94. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

95. A corrections officer pepper sprayed and restrained Margaret Jackintell for objecting to his verbal abuse of other inmates.

96. Margaret Jackintell is a 57-year old Navy veteran. She was booked into the county jail inDecember 2018.

97. While incarcerated, she observed a corrections officer verbally abusing other incarcerated women. She voiced her disagreement at the way he was addressing them. Corrections staff responded savagely, tackling her to the ground and triggering an anxiety attack. A guard saturated her with pepper spray before strapping her into a restraint chair.

98. Jail staff left Ms. Jackintell in the restraint chair, covered in pepper spray, forapproximately 12 hours. During that time, she was denied food, water, or the opportunity to use the restroom facilities.

99. For days after she was released from the chair, corrections staff refused to allow her to shower or clean herself.

100. After she endured this abuse, a supervisor named Bitterman repeatedly came to her cell to taunt her saying, e.g., "You're no (F-N) kind of veteran, you (F-N) bitch! I don't believe you're a veteran."

101. The jail held no one accountable.

102. The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.Corrections officers beat Terrence Debose while he was strapped into a restraint chair.

103. On March 22, 2019, a corrections officer strapped Terrence Debose in a restraint chair in a small cell. Mr. Debose suffers from mental illness.

104. While Mr. Debose was restrained, Officer Nicholas Evans turned off his body-worn camera and repeatedly punched Mr. Debose in the face. Another corrections officer, Defendant TimothyDugan, entered the room and joined in the abuse, punching Mr. Debose twice in the face.

105. As a result of the attack, Mr. Debose suffered a concussion.

106. Evans was indicted for felonious assault and Dugan was indicted for misdemeanor assault. Upon information and belief Defendants Evans and Dugan were duly convicted by a jury and await sentencing.

107. The jail held no one accountable.

Electronically Filed 03/16/2020 19:56 / / CV 20 931048 / Confirmation Nbr. 1969711 / CLAJB

108. The treatment Plaintiff Lorinzo Sampson has endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained in Cuyahoga County Jail.

109. On information and belief, there are incidents of excessive force and abuse by corrections officers—including retaliatory and punitive use of restraints and pepper spray—in addition to those listed above.

## COUNT I: FALSE ARREST/IMPRISONMENT

110. Plaintiff repeats and alleges paragraphs 1 through 109 as though fully set forth herein.

111. Acting within the course and scope of his employment as a police officer with the City of Cleveland, Defendant Hovart, the Arresting Officer knowingly and intentionally caused Plaintiff to be confined and detained within a corrupt, brutal and  limited area from December 22-23, 2018, against Plaintiffs will and without probable cause or lawful justification.

112. The Arresting Officers knew, or should have known, that there was no probable cause to support the issuance of the arrest warrant.

113. Because there was no probable cause to support the arrest, issued under false pretenses and issued only because of retaliation, and intentionally or recklessly omitted information, the arrest or arrest warrant was void as a matter of law.

114. The Arresting Cleveland Police Department Officer and assisting Defendants Cuyahoga County Correctional Officers and SRT team members acted knowingly, intentionally, and deliberately, with malicious purpose, in bad faith, or in a reckless or wanton manner, warranting the imposition of exemplary punitive damages.

115. As a direct and proximate result of Plaintiff Lorinzo Sampson's false arrest/imprisonment, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT II: VIOLATION OF 42 U.S.C. §1983 - FALSE ARREST/IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT

116. Plaintiff repeats and alleges paragraph 1 through 115 as though fully set forth herein.

117. Acting under color of law and within the course and scope of their employment as a police officer with the City of Cleveland, the Arresting Officers arrested Plaintiff and Defendants held him and processed him for imprisonment against his will without probable cause or lawful justification in violation of Plaintiff s rights guaranteed under the Fourth Amendment.

118. Plaintiff was detained and held against his will and without lawful justification from December 22, 2018through December 23, 2018, when Plaintiff was finally released from jail.

119. The Arresting Officers knew, or should have known, that there was no probable cause to

support a warrantless arrest, or the issuance of an arrest warrant.

120. The Arresting Officer also acted knowingly, intentionally, and deliberately with malicious intention when he intentionally, or at least recklessly, withheld key information from the County Defendants when presenting evidence for an arrest and jail booking.

121. In arresting and causing Plaintiff s detention, arrest, and being held against his will under the circumstances at issue, the Arresting Officers acted wantonly, willfully, recklessly, without justification, and maliciously, warranting the imposition of exemplary punitive damages.

122. Faced with the circumstances present on December 23, 2013, a reasonably prudent law enforcement officer would or should have known that arresting or causing the arrest, detention

and/or holding of Plaintiff against his will violated Plaintiffs clearly established Fourth and Fourteenth Amendment rights.

123. As a direct and proximate result of their unlawful, wrongful and false arrest, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT III: VIOLATION OF 42 U.S.C. S1983 - MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AMENDMENT

124. Plaintiff repeats and alleges paragraphs 1 through 123 as though fully set forth herein.

125. Plaintiff was charged with one count of open container; prohibited and a second count of disorderly conduct in the Cleveland Municipal Court.

126. The Defendants City of Cleveland and its police office employee, Defendant Hovart, knowingly, intentionally, and deliberately made, influenced, and/or participated in the decision to prosecute Plaintiff.

127. There was a complete lack of probable cause for Plaintiff's criminal prosecution.

128. As a consequence of the legal proceeding against Plaintiff, Plaintiff suffered a deprivation of liberty apart from the initial seizure on December 22, 2018.

129. Specifically, Plaintiff was forced to spend a day in a cold isolated jail cell restrained to a chair without medical treatment, food, water or clothing on December 22, 2018 and was further required to attend all criminal court proceedings including trial until Plaintiff was found not guilty on March 20, 2019.

130. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT IV: VIOLATION OF 42 U.S.C. §1983 - CUSTOMS AND POLICIES CAUSING CONSTITUTIONAL VIOLATIONS AND RATIFICATION

131. Plaintiff repeats and alleges paragraphs 1 through 130 as though fully set forth herein.

132. Upon information and belief, All named Defendants including John Does 9-13 and Jane Doe 14 have a history of violating citizens' constitutional rights, making arrests without probable cause, and charging citizens with criminal offenses that are not supported by probable cause, about which the City is, and was at all relevant times, aware and subjecting them to cruel and unusual punishment by Defendant Cuyahoga County and other named County Defendants.

133. Upon information and belief, Defendant City of Cleveland and Defendant Cuyahoga County failed to adequately and properly train and/or supervise all employees, individual and officially named Defendants including John Does 9-13 and Jane Doe 14.

134. The Defendant City of Cleveland and Defendant Cuyahoga Countyratified all named Defendant's conduct including John Does 9 -13 and Jane Doe's conduct described herein.

135. Upon information and belief, the City of Cleveland implemented customs and policies for training and supervision of  Defendant Hovart and other N.I.C.E. unit police officers on lawful arrests and criminal prosecution/pursuing criminal charges supported by probable cause that, on their face, violate the Fourth and Fourteenth Amendment. Alternatively, upon information and belief, the City implemented otherwise facially valid customs and policies in such a manner that constitutional violations were likely to be and were visited upon citizens, including Plaintiff.

136. As a direct and proximate result of the City's customs and policies described herein, which violate the Fourth and Fourteenth Amendments on their face, or otherwise are applied insuch a

manner that Fourth and Fourteenth Amendment violations are likely to and do occur, Plaintiff has suffered damages in an amount to be determined at trial.

## **COUNT V:INTENTIONAL TORT-BATTERY**

137. Plaintiff repeats and alleges paragraphs 1 through 136 as though fully set forth herein.

138. The Arresting Officer intentionally escorted Plaintiff to the Justice Center without handcuffs and then initiating an argument with Plaintiff and unlawfully handcuffed Plaintiff once they arrived at the Justice Center to give or present Plaintiff in a false light and appearance of being resistant to arrest.

139. The Arresting Officer did not have probable cause to arrest Plaintiff.

140. The Arresting Officers knew, or should have known, that there was no probable cause to support a warrantless arrest under the Fourth Amendment or the issuance of an arrest warrant.

141. The Arresting Officer and County Defendants actions were malicious, in bad faith, and/or wanton and reckless.

142. As a direct and proximate result of the Arresting Officer's and all other named Defendants including John Does 9-13 and Jane Doe 14 unlawful touching, pushing, slamming to the concrete floor, beatings and twelve hours of torture that followed, Plaintiff has suffered damages in an amount to be determined at trial.

**CLAIM VI: FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
FORA CUSTOM, POLICY, PATTERN, OR PRACTICE TOLERATING THE USE OF
EXCESSIVE FORCE (AGAINST CUYAHOGA COUNTY)**

143. Plaintiff repeats and alleges paragraphs 1 through 142 as though fully set forth herein.

144. Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to a pattern and practice of excessive force by its corrections officers at the jail. This widespread tolerance of excessive force by corrections officers constitutes a county policy, practice, pattern, or custom, and led to Plaintiff Sampson being brutally attacked by approximately a dozen SRT team members (aka men in black) confined to a restraint chair and tortured for twelve hours for wanting or attempting to file a complaint with Defendant Hovart's supervising officer.

145. The behavior of the individual Defendants and their coworkers is part of a recurringpattern of excessive force used on the people in custody at the countyjail.

146. Corrections personnel failed to take basic, appropriate steps to protect Plaintiff Sampson from retaliatory acts, and violence or to intervene when he was subjected to it.

147. Cuyahoga County's customs, policies, patterns, and practices have created a toxic culture that has desensitized its corrections personnel to brutal, sadistic violence at the jail because that violence is something wholly unremarkable. Defendants were and are in constant and knowingly violations not wearing body cams and attacking and beating persons in areas of the jail where the security cameras don't operate.  If the County wanted to prevent this unwarranted conduct, it would have swiftly admonished Defendants who repeatedly violate the use of force policy and replaced all faulty cameras. The individual Defendants' savage and casual resort to violence is an ordinary aspect of jail culture that those incarcerated have learned to expect and that those responsible for overseeing the jail staff have fostered and tolerated.

148. Based on previous instances of unjustified use of excessive force (some of which are described above), Defendant Cuyahoga County had notice of a pattern of constitutionally offensive acts by its corrections officers but failed to take any remedial steps in response to the notice.

149. The culture of the punitive violence cultivated at the county jail was apparent to federal investigators who assessed the facility in the year of 2018.

150. According to the Quality Assurance Review of the Cuyahoga County CorrectionsCenter, the United States Marshals Service found the following deficiencies related to use of force:

> a. "Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and debriefings, removing staff involved at the on-set of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). Additionally, video tapes involving UOF are not tagged and labeled as evidence. Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.)." Id. at 35.

> b. "Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black," based on their black para-military uniforms." Id."

> c. "During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members directed at detainees/inmates." Id.

> d. "SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches," as they escorted them to

and from the interview location. The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10 detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety." Id.

151. By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, pattern, and custom of corrections officers using excessive force against people in custody, under which Plaintiff Sampson and others were repeatedly victimized, Defendant Cuyahoga County deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of theUnited States.

152. As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff Sampson suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering, as he has currently been diagnosed with PTSD and under continuing mental health treatment.

**CLAIM VII FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE/FAILURE TO TRAIN AND SUPERVISE CORRECTIONS OFFICERS (AGAINST CUYAHOGA COUNTY)**

153. Plaintiff repeats and alleges paragraphs 1 through 152 as though fully set forth herein.

154. Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to its failure to train and supervise corrections officers on how to protect people from known threats and how to interact with people in custody, including use of restraints and chemical agents as punishment, use of force on an person who is handcuffed and obedient, use of threats and punishment to curtail protected speech, and providing access to basic hygiene and necessities of human life.

155. Defendant Cuyahoga County failed to train and supervise its corrections officers on how to use the best use-of-force tactics to ensure the safety of incarcerated citizens. The behavior of the

individual Defendants, and the other employees who did nothing after Plaintiff Sampson was victimized, is consistent with a recurring pattern of how corrections officers interact with people in custody at the jail, due to a lack of training and accountability.

156. Defendant Cuyahoga County had notice of its failure to train and supervise its corrections personnel, which resulted in a pattern of constitutionally offensive acts by its corrections officers. The Defendant County failed to take any remedial steps which resulted in Plaintiff's horrifying and torturous treatment in being restrained to a chair while half naked in a cold rubber jail cell with no medicine, food, water or place to urinate or defecate other than on himself, which unfortunately he did.

157. Corrections staff behaved this way because it was consistent with Defendant Cuyahoga County's culture of retaliatory violence and abuse against the people detained in its jail.

158. On information and belief, Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections officers' violent and abusive conduct by failing to intervene and prevent abuse. The County was deliberately indifferent to the obligation to train corrections officers on how to behave.

159. For example, as stated above, Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to, Glenn Mayerjr., Tyrone Hipps, Jr., Joshua Casdeberry, Terrence Debose, Chantelle Glass, Blanche Hill, Antione Blackshear, Joseph Sawyer, Margaret Jackintell, Timothy Bennett, Corrionne Lawrence and countless other citizens.

160. As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Plaintiff Sampson suffered and will continue to suffer economic and non-economic damages for

which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM VIII: FIRST AND FOURTEENTH AMENDMENT (RETALIATION) UNDER 42 U.S.C. § 1983 (AGAINST CUYAHOGA COUNTY)

161. Plaintiff repeats and alleges paragraphs 1 through 160 as though fully set forth herein.

162. Defendant Cuyahoga County created a custom, policy, pattern, and practice of permitting retaliation against incarcerated citizens for speaking out about abuse or corruption in the jail, including permitting retaliation against the individuals who were cooperating with the federal investigation into jail conditions.

163. As part of the jail's entrenched snitching-abatement protocol—which was in full effect well before the federal marshals appeared in late October 2018—staff engaged in verbal and physical abuse of incarcerated men and women for speaking out on matters of public concern in the jail.

164. When corrections staff learned of the federal investigation into jail conditions, the staff made no effort to hide their anger at those cooperating. The retaliatory climate was instant and obvious to both rank-and-file and supervisory employees.

165. Defendant Cuyahoga County took no steps to address or remedy the retaliation SRT officers were dishing out until Chief Anderson from the Marshals Service complained to Sheriff Pinkney. Only, once it was clear that the federal government knew what the SRT officers were up to did the County take any steps to address the retaliation. The County did absolutely nothing to hold the retaliators accountable, thereby sending a powerful message regarding its continuing tolerance for staff abuses.

166. Plaintiff's treatment is strikingly the same as to the abusive treatment received by other inmates who were similarly situated. Defendants'custom, policy, pattern, and practice is maintaining the corrupt and abusive conditions above all else.

167. As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Plaintiff Sampson suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM IX: FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATION UNDER 42 U.S.C. § 1983 (AGAINST CUYAHOGA COUNTY)

168. Plaintiff repeats and alleges paragraphs 1 through 167 as though fully set forth herein.

169. Defendant Cuyahoga County was deliberately indifferent to its duty to protect Plaintiff Sampson, its duty to not use or threaten to use needless force or cause him bodily harm, and its duty to provide him with clearly needed medical care. Cuyahoga County's failures show its utter disregard for Plaintiff Sampson's constitutional rights in a manner that shocks the conscience.

170. Defendant Cuyahoga County has a custom, policy, pattern, and practice of confining individuals in its custody to restraint chairs in isolation confinement as a punitive measure. These restraints are imposed in a malicious and sadistic manner for the very purpose of causing harm.

171. Plaintiff Sampson was harmed by the County's policy of imposing needless force to restrain those in its custody when he was confined to a restraint chair for voicing and requesting to make a complaint or grievance against Defendant Hovart during booking, Defendants referring to Plaintiff as a smart ass "Eric Garner" type of fucker.

172. Defendant Cuyahoga County has a custom, policy, pattern, and practice of imposing needless force and threats of force on those in its custody. This force is threatened and imposed in a malicious and sadistic manner for the very purpose of causing harm.

173. PlaintiffSampson whose weight was approximately 333 pounds and height at 6ft.4 inches tall suffered a brutal take down that resulted in injuries included but not limited to his neck (while Mr. Sampson was handcuffed and compliant), The SRT terror and violence campaign perpetrated on incarcerated citizens was so horrific it was reported as constitutional and criminal abuses to federal investigators.

174. Defendant Cuyahoga County's corruption, infestation of drugs, denial of medical treatment,terror and violence campaign was so prevailing upon information and belief it resulted in the deaths of Kalvin O. Berry in 2016. And from May 10, 2019, nine (9)suspicious deaths of county inmates occurred since June of 2018.

175. Defendant Cuyahoga County had a custom, policy, pattern, and practice of failing to provide clearly needed medical care to those within its custody.

176. Plaintiff Sampson suffered as a result of the County's failure to provide clearly needed medical care. While he was in restraints for 12 hours he screamed for an inhaler because he suffered from asthma related symptoms of shortness of breath, and excruciating pain from his tooth being knocked out from being punched and smashed in the mouth with a pepper spray can by Defendants.

177. The kind of casual cruelty that Plaintiff Sampson experienced in the jail is far from unique. That this is how the County elects to operate its jail shocks the conscience.

178. As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Plaintiff Sampson suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM X: FOURTEENTH AMEND. PROCEDURAL DUE PROCESS VIOLATION UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANT CUYAHOGA COUNTY)

179. Plaintiff repeats and alleges paragraphs 1 through 178 as though fully set forth herein.

180. As detailed above, the jail never responded to Plaintiff's grievance about the severe beating and administrative-segregation restrictions in being held in segregation in a rubber cell and restrained to chair for 12 hours, thus subjecting him to unfair deprivations without due process.

181. As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Plaintiff Sampson suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering. Claim6 Fourteenth Amendment Excessive-Force violation Under 42 U.S.C. § 1983 (against all County Defendants including John Does 9-13 and Jane Doe 14 in their official and individual capacities)

182. Plaintiff Sampson incorporates all previous allegations.

183. Defendants SRT team members took turns beating Plaintiff to the point of unconsciousness and upon information and belief Defendants bad conduct and use of excessive force went unrecorded and taking place all while Plaintiff Sampson was handcuffed. That use of force was unnecessary, gratuitous, and objectively unreasonable.

184. All the facts and circumstances surrounding these incidents cannot be viewed subjectively or objectively to support any use of force, let alone the extreme level of force these Defendants used, or their failure to file use of force reports or related documentation.

185. As a direct and proximate result of these Defendants' unlawful and sadistic conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

186. Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter these Defendants and others from engaging in this type of unlawful conduct.

## CLAIM XI: FIRST AND FOURTEENTHAMENDMENT VIOLATION (RETALIATION) UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANTDONALD HOVART IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES)

187. Plaintiff repeats and alleges paragraphs 1 through 186 as though fully set forth herein.

188. In response to Plaintiff Sampson's efforts to report Defendant Donald Hovart's abuse of police powers from illegally seizing the person of Plaintiff Sampson in order to effectuate an arrest without probable cause, and in retaliation for Plaintiff's speaking out and requesting to make a grievance to Defendant's supervising Officer.

189. In response to Plaintiff Sampson's requests to be granted access to a grievance to Defendant's supervisor, Defendant Hovart and his County Co-Defendantsslammed Plaintiff Sampson to the concrete floor, and crushed his finger causing dislocation and extreme pain.

190. In response to Plaintiff's voicing his grievance Defendant Hovart threatened Plaintiff with a false arrest and carry out his threat as promised.

191. Plaintiff Sampson engaged in protected conduct when he indicated that he wanted to file a grievance against Defendant Hovart. The subject of Defendant Hovart's conduct as team member of the newly formed City of Cleveland N.I.C.E. unit, on which Plaintiff engaged is a matter of public concern and community interest.

192. Defendants' actions in response to Plaintiff Sampson's protected conduct would chill a person of ordinary firmness from exercising his right to speak out on matters of public concern.

193. As a direct and proximate result of Defendant Hovart's deceitful and unlawful conduct, Plaintiff Sampson suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

194. Defendant Hovart's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of deceitful and unlawful conduct.

## CLAIM XII: CIVIL LIABILITY FOR CRIMINAL ACTS UNDER R. C. § 2307.60(A) (1) (AGAINST DEFENDANTS DOE 1, WITT, LITTLE, SMITH, HICKERSON, AND DOE 2 IN THEIR INDIVIDUAL CAPACITIES)

195. Plaintiff repeats and alleges paragraphs 1 through 194 as though fully set forth herein..

196. The conduct complained of above constitutes criminal acts on the part of the individual Defendants. The crimes include, but are not limited to, a. felonious assault (R.C. 2903.11(A)(1)); b. assault (R.C. 2903.13(A)); c. interfering with civil rights (R.C. 2921.45(A)); d. unlawful restraint (R.C. 2905.03(A)); e. intimidation (R.C. 2921.03(A)); and f. dereliction of duty (R.C. 2921.44(C)(2)).

197. As a direct and proximate result of the individual Defendants' intentional, knowing, and purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Plaintiff Sampson's rights, he has suffered and will continue to suffer economic and noneconomic damages for which all Defendants are liable, including, but not limited to mental, emotional, and physical pain and suffering, as well as punitive damages.

198. These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct. Prayer for Relief For the reasons stated, Plaintiff Sampson respectfully requests the following relief from the Court.

<u>PRAYER FOR RELIEF:</u>

    A.  The Court grant judgment in Plaintiff's favor and against Defendants for an amount to be determined at trial, plus punitive damages, statutory interest, attorney fees, costs, and other expenses incurred such that Plaintiff is made whole.

    B.  The Court finds False Arrest/Imprisonment inViolation ofthe Fourth Amendment: The Court grant judgment in Plaintiff's favor and against Defendants for an amount to be determined at trial, plus punitive damages, statutory interest, attorney fees, costs, and other expenses incurred such that Plaintiff is made whole.

    C.  The Court finds Malicious Prosecution in Violation of theFourth Amendment: The Court grant judgment in Plaintiff's favor and against Defendants foran amount to be determined at trial, plus punitive damages, statutory interest, attorney fees, costs, and other expenses incurred such that Plaintiff is made whole.

    D.  The Court finds Customs and Policies CausingConstitutional Violations and Ratification: The Court grant judgment in Plaintiff favor and against Defendants for an amount to be determined at trial, plus punitive damages, statutory interest, attorney fees, costs, and other expenses incurred such that Plaintiff is made whole.

E.  The Court finds an intentional Tort and Battery and grant judgment in Plaintiffs favor and against Defendants for an amount to be determined at trial, plus punitive damages, statutory interest, attorney fees, costs, and other expenses incurred such that Plaintiff is made whole.

F.  The Court finds for any other relief that this Court deems just and appropriate. Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983 and state law Enter judgment in Plaintiff Lorinzo Sampson's favor on all claims for relief.

G.  Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, that Plaintiff Sampson have suffered and are reasonably certain to suffer in the future.

H.  Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct.

I.  Award pre- and post-judgment interest at the highest lawful rate.

J.  Award Plaintiff Sampson their reasonable attorneys' fees and all other costs of suit.

K.  Enjoin Defendants from perpetrating further unlawful acts such as the ones that injured Plaintiff Sampson; and

L.  Award all other relief in law or equity, including injunctive relief, to which Plaintiff Sampson is entitled and that the Court deems equitable, just, and proper. Jury Demand Plaintiff Sampson demands a trial by jury on all issues within this complaint.

WHEREFORE, Plaintiff prays for judgment against Defendants accordingly.

Respectfully submitted,

/ s / *Tyrone E. Reed*                .
TYRONE E. REED, #0030839
11811 Shaker Blvd. #420
Cleveland, Ohio 44120
(216) 231-7936
(216) 231-6014, Fax
E-Mail: T_Reedlaw@msn.com

ATTORNEY FOR PLAINTIFF
LORINZO SAMPSON

<u>JURY DEMAND</u>

Plaintiff demand a trial by Jury

/ s / *Tyrone E. Reed*        .
TYRONE E. REED,
 Reg#0030839

Electronically Filed 03/16/2020 19:56 /  / CV 20 931048 / Confirmation Nbr. 1969711 / CLAJB